[No. 1993.]

## Tom. Pierson *v.* The State.

1. Practice—Change of Venue—Controverting Affidavits.—Article 583 of the Code of Criminal Procedure provides as follows: "The credibility of the persons making affidavits for change of venue, or their means of knowledge, may be attacked by the affidavit of a credible person, and the issue thus formed may be tried and determined by the judge, and the application granted or refused as the law and the facts shall warrant." See the opinion *in extenso* for a controverting affidavit *held* sufficient to raise the issue of prejudice or no prejudice, in resistance to the application for a change of venue.

2. Same—Evidence.—The filing by the State of a sufficient controverting affidavit raises, upon the application for the change of venue, an issue of fact as to the truth of the grounds set up in the application; and evidence *pro* and *con* the application, in addition to the testimony of the compurgators and the controverting affiants, is admissible upon the issue thus raised, the burden of proof resting upon the applicant. That the trial court, as in this case, imposed that burden upon the State was an error of which the defendant can not be heard to complain. See the opinion *in extenso* on the question.

3. Same—Jury Law.—A person is not disqualified as a juror because of opinion unless there has been established in his mind such a conclusion

of the guilt or innocence of *the accused* as will influence him in finding his verdict. The mere fact that the proposed juror heard the trial of the accused's co-defendant, for the same offense, and approved the verdict of conviction, will not suffice to disqualify the juror.

4. SAME.—A proposed juror sought excuse from service upon the ground that he was one of the compurgators to the defendant's application for a change of venue. He was held competent by the trial court, and was accepted by the State. The proposed juror further protesting that he might be held responsible in the event of the acquittal of the defendant, he was excused by the trial court without the acceptance or rejection of the defendant. To this action of the trial court the defendant excepted. The State's attorney thereupon had the juror recalled and tendered to the defendant, and asked if the defendant would accept the juror and have him sworn. The defendant replied that he stood "mute," and the court again excused the juror, and the defendant excepted. *Held* that, having declined the proffered juror, the defendant has nothing to complain of.

5. SAME.—It was not error for the trial court to refuse to permit the defendant to peremptorily challenge a proffered juror after his peremptory challenges were exhausted.

6. SAME—EVIDENCE.—Declarations of the deceased made within five minutes after he was shot, as to what person or persons shot him, are held admissible as part of the *res gestæ* in the present case, under all the facts in proof.

7. SAME—DYING DECLARATIONS—PREDICATE.—As a predicate for the admission of the dying declaration of the deceased, made to his medical attendant on the morning after the injury, the State proved by the medical attendant that he found the deceased to be rational and conscious of approaching death; that the deceased concurred with the witness that the wound was mortal; and that in reply to deceased's question, the witness said to him: "You know as well as I do that this character of case is usually fatal." and the deceased assented and replied that he was satisfied it would kill him     *Held* sufficient as a predicate for the admission of the dying declarations.

8. SAME.—As a predicate for the admission of the dying declaration of the deceased to another witness, the State proved by another witness that when he entered the room in which the deceased was lying, the deceased said: "Rosenberg, I can not live, and I want to make my dying statement." *Held* sufficient.

9. SAME—PRIVILEGE OF COUNSEL.—See the opinion *in extenso* for remarks of the prosecuting attorney, in argument to the jury, *held* legitimate, in view of the previous utterances of counsel for the defense upon the same subject.

10. MURDER—FACT CASE.—See the statement of the case for evidence *held* sufficient to support a conviction for murder in the first degree.

APPEAL from the District Court of Travis. Tried below before the Hon. A. S. Walker.

This is the companion case to that of Bob Pierson v. The State, which will be found reported in full in the eighteenth volume of these Reports, commencing on page 524. This conviction was in the first degree for the murder of Doctor J. C. Stovall, in Travis county, Texas, on the sixteenth day of March, 1885. A life term in the penitentiary was the penalty assessed by the jury against this appellant.

Dennis Corwin, the first witness for the State, identified the diagram used upon the trial of Bob Pierson's case (see 18 Texas Ct. App., page 526), as the diagram made by him, showing with sufficient accuracy for all practical purposes the locality along and adjacent to the Lockhart road, leading from the San Antonio road to Bluff Springs. Explaining the diagram, the witness testified substantially as he did on the trial of Bob Pierson.

State witnesses Felix E. Smith and Mrs. Felix E. Smith testified substantially as they did on the trial of Bob Pierson. Likewise did the State's witnesses W. H. Thaxton, Fayette Smith, Jim Rountree and Jim Overton.

In so far as Mrs. Jane Pierson's narrative on the trial of Bob Pierson involved this defendant, it was repeated, in substance, on this trial. The witness was a sister-in-law to the defendant.

William Bartlett testified, for the State, that in March, 1885, he lived about two miles distant from Wade Smith's store. He first met the defendant, to know him, on the Saturday before the assassination of Doctor Stovall. Witness knew Lee Leverton by sight. Witness saw Leverton and the defendant together on March 16, 1885, at the Lockhart crossing of Onion creek. The witness heard next morning of the shooting of Doctor Stovall.

Cross-examined, witness said it was about four o'clock in the afternoon when he met Leverton and defendant at the Onion creek ford. Witness and Leverton first met at the point indicated, and were engaged in conversation when the defendant joined them. The three talked for some time together, and the witness then went to his work—wood chopping—and left Leverton and defendant together at the creek. Witness did not look back after leaving them, and did not know when they left the creek, nor in what direction they went. No one passed while witness, defendant and Leverton were at the ford that the witness could remember. Witness knew Fayette Smith by sight. Fayette Smith, according to witness's recollection, passed over the

road after witness had separated from Leverton and defendant, and had crossed the creek.

Bud Douglass testified, for the State, that at the time of the shooting of Doctor Stovall he, witness, lived about fifteen miles south from Austin. Witness was then acquainted with the defendant and Bob Pierson. Tom Pierson, jr., the son of the widow Jane Pierson, had been for some time in the employ of witness's father, on Ward's ranch. Tom Pierson, jr., with witness, witness's father and Tom Titus, came to Austin on March 16, 1885, to collect wages due them. For that purpose they went to the office of Doctor Ward, over DeCordova & Son's land office, on Congress avenue. Witness's father secured a check covering the wages due, and the parties started down the avenue to the First National bank. Witness and Tom Pierson, jr., started off, walking abreast. When they had walked about twenty feet witness heard some one call Tom. Young Tom looked back and remarked: "There is uncle Tom and uncle Bob." Witness turned and started back, but observing that they wanted only to see young Tom, he went on. Witness afterwards saw young Tom at the First National bank. Witness did not stop at the widow Pierson's on the way to town on that morning. Young Tom was in the wagon with witness, his father and Titus, when the widow Pierson's house was passed. Witness heard of the assassination of Doctor Stovall about two o'clock on the next day.

Cross-examined, the witness said that the widow Pierson's house stood about one hundred yards distant from the road; and to get to the house, one would have to go up the pasture a considerable distance to find a gate.

Wade Smith testified, for the State, that in March, 1885, he lived about eight miles south of Austin, at Bluff Springs, a few yards beyond Onion creek, on the Lockhart road. The witness kept a store at the point indicated, and was also postmaster. Witness was then acquainted with the defendant and his brother, Bob Pierson. Witness had a short conversation with defendant at the store on Sunday, March 15, 1885. Defendant said that he was going to the widow Pierson's to sit up with 'Shack, and remarked: "I went after a doctor that is a city doctor. I went in and got Doctor Cummings, and brought him out. I am going up to-night and give the medicine Doctor Cummings has prescribed." He remarked, further, that Mrs. Rose and others seemed to regard Doctor Stovall as a Savior. He said

that 'Shack's sister, who was also sick, would not resign Doctor Stovall's treatment for that of the city doctors. Defendant said that Doctor Stovall had been treating the widow Pierson's family; that he, defendant, had called in Doctor Cummings, and that he was going to see that the physic prescribed by Doctor Cummings was taken. He said that he got 'Shack's consent to call in Cummings, but that the old woman (widow Pierson) would not consent to the change in Nancy Jane's behalf. His further remark was that old Mrs. Rose and others adhered to Doctor Stovall, and as he did not want to see Stovall kill the whole family, he went off and got Cummings to attend to 'Shack.

Defendant came to witness's store on the next evening, March 16, 1885, about thirty minutes before sundown. He remained about the store until the sun set. He rode up to Leverton's gate, which was about three hundred yards from the ford over Onion creek. Leverton was with him, walking. They drove up and penned some horses at Leverton's. Leverton's house was but twenty yards distant from witness's store, and witness saw defendant and Leverton distinctly, and knew them. Witness did not remember what parties were at the store at the time. Perkins was there. Doctor Davidson and Mr. Magness may or may not have been there. The defendant was riding a sorrel bald faced horse on that evening, an animal which the witness knew well. He was then living on a place which belonged to witness, but which was under lease to his brother, J. Woods Smith. Leverton also lived on witness's farm, but on the west side of the Lockhart road. Between nine and ten o'clock on the night of the said March 16, 1885, Fritz Odenheimer arrived at the house of the witness, with the information that Doctor Stovall had been shot. Odenheimer stepped to the door and said: "Mr. Smith, I want you and Doctor Davidson." Walking to the gate, witness encountered Jasper Grindstaff, whom he recognized from the inside of the yard. Witness got his saddle, and going to the fence, met Pat Cain. About fifteen minutes, or perhaps more, before Odenheimer arrived, the witness heard some parties pass his house rapidly, going south. He thought at the time that the parties were some young men who had been down on the creek fishing. It was about thirty feet from the door of the room in which the witness was when Odenheimer arrived, to the fence, at which distance witness recognized Grindstaff and Cain. The lamp light was not reflected on Grindstaff and

Cain. Odenheimer did not tell witness who, or that any one, came with him, or were out at the fence. Witness had never heard defendant say much of anything against Doctor Stovall.

Cross-examined, the witness testified that, when defendant came to his store on Sunday evening, March 15, 1885, he came from the direction of his home, and when he left he went in the direction of Austin. Witness again related the circumstances of defendant's visit to his store on the evening of Monday, March 16, 1885. He came up to the store as soon as he and Leverton penned the horses they drove up from the direction of the ford, where Leverton usually watered his stock. He got down and remained at the store fifteen or twenty minutes. Witness could recollect nothing the defendant said that evening, except that he called to witness while the latter was in his garden and said: "Wade, I met one of your old cronies in Austin, and I asked him if he treated you right. He said he did, and I said that is all right." The stock driven up and penned by defendant and Leverton was Leverton's farm stock, and consisted of two bald faced horses, a bay pony, and two mules. The bay pony was used by Leverton for riding purposes. Witness, Doctor Davidson, Mr. Hart and some one else were in a little out house called the "Boys' Ranch," playing cards, when Odenheimer came with the news that Doctor Stovall had been shot. Witness stepped to the door immediately and recognized Grindstaff and Cain, sitting on their horses, outside the fence, thirty feet distant. He saw at once that Grindstaff was bare headed. Cain was the first of the two parties named to speak. Witness told Odenheimer to saddle his, witness's, horse for him, while he went to the house for his pistol. Odenheimer and Doctor Davidson went to the horse lot together. Witness got back to the "Boys' Ranch" before Odenheimer got the horse saddled. When witness heard the parties pass the house a short time before Odenheimer arrived, he got up from the card table and went to the door, thinking the parties were a number of boys who had gone fishing, and that they would want to get into the store. Those parties were not Odenheimer, Grindstaff and Cain. Defendant owned one or two horses and a mule.

Doctor A. M. Davidson testified, for the State, that he was at Wade Smith's store on the evening of March 16, 1885, and saw the defendant at that store late on that evening. Defendant, in speaking of the deceased, remarked that Doctor Stovall should not treat a dog of his; that Doctor Stovall had been treating a

couple of cases at the widow Pierson's, and that he, defendant, went to Austin on the Sunday previous and got Doctor Cummings to come out and take charge of 'Shack's case, and that if Doctor Stovall continued to treat Nancy Jane, she would be dead inside of ten days.

Cross-examined, the witness said that the conversation with defendant, referred to, occurred on the gallery of Wade Smith's store, about thirty minutes before sundown, on the evening of Monday, March 16, 1885, in the presence of Perkins and Magness. Defendant left Smith's store on that evening between fifteen and thirty minutes by sun, and went in the direction of his home. Witness, Billie Hart, Perkins and Wade Smith were in the "Boys' Ranch" that night when Odenheimer brought the news of Doctor Stovall's assassination. Witness thought it to be about nine o'clock when Odenheimer arrived, but he could not be exact as to the time. The door of the house was shut. Witness heard no horsemen pass the house prior to Odenheimer's arrival, nor could he recall a remark made by any one about horsemen passing. Witness did not remember whether some one of the party inside, or Odenheimer himself, opened the door. The party playing cards had nothing to drink in the house. Wade Smith was perfectly sober. Odenheimer came for witness to go to see Doctor Stovall, and witness saddled his horse and went at once. Witness did not know whether or not Wade Smith saddled his horse, but he knew that Wade did not go with him to the stable. Wade went with him to see Doctor Stovall. Witness did not look towards the fence, thirty feet away, and did not see what men were out there.

Ben Magness testified, for the State, that he met the defendant at Wade Smith's store on the evening of Monday, March 16, 1885, and heard him speak about Doctor Stovall. He said that 'Shack and Nancy Jane Pierson were sick; that on Saturday they sent for him and told him they wanted another doctor to treat them; that he went to Austin and employed another doctor for them; that 'Shack told him he would not live three days longer under Doctor Stovall's treatment. Witness remarked to defendant in reply: "I think Doctor Stovall is a very good physician; he has always had very good luck at my house." The defendant replied: "Ben, you can do as you d——d please, but he should not treat a dog at my house. I told George Rose a few days ago that I believed he had Stovall employed to kill off

his wife's relations." Rose's wife was, in some way, connected with the Piersons.

George W. Rose testified, for the State, that in March, 1885, he lived on the east side of the Lockhart road, across from the house occupied by the widow Pierson. Witness was at the widow Pierson's house when the shooting of Doctor Stovall occurred. He heard the shots, of which there were five, as near as he could count them. He then heard the noise made by two horses running across the bridge on Boggy creek. He could not tell in which direction they were going. After a short interval witness heard two horses started in a run from the side of the bridge near which the shots were fired, towards Mrs. Pierson's house. Those two horses came up the lane towards Mrs. Pierson's house, but checked up before reaching the house. Witness was standing on the widow Pierson's gallery, listening, when the horses last mentioned started. He told Tom Pierson, jr., and Black Bill Johnson to run to the fence, one hundred yards distant, and see, as they passed, who the parties were. The boys accordingly ran to the road and secreted themselves in a corner of the fence, but the parties checked up and did not pass Mrs. Pierson's house. They checked up near the witness's gate; which was opposite the west lane, and south of Mrs. Pierson's gallery, where the witness then was. The two horses last mentioned did not go on the Boggy bridge, but must have run some six or seven hundred yards from the point where they started until they checked up. From the witness's gate to the point where the shooting of Doctor Stovall took place, the distance was about eight hundred yards, a little more or less. Judging by the sound of the feet of the last mentioned two horses, they must have checked up about one hundred yards from the witness's gate, and about three hundred yards from the widow Pierson's gallery. The horses ran directly towards Mrs. Pierson's house. Witness heard of the shooting of Doctor Stovall about seven o'clock next morning.

Cross-examined, the witness stated that he had never heard the defendant threaten the life of Doctor Stovall. He had heard defendant criticise Doctor Stovall as a physician. A watch, running very slow and much behind time, was in Mrs. Pierson's house. By that watch the shots were fired near eight o'clock. Witness heard nothing like horses running until the first two spoken of struck the bridge. Those two horses, the witness thought, crossed the bridge, but from which side of the creek he

was unable to say. Witness heard no more of those horses after they crossed the bridge, but presently he heard the other two horses start, running towards him, from a point between the bridge and witness. They evidently started from a point near where the shots were fired, and not far from Wiley's house. Witness could not say positively that those two horses were not the horses that ran across the bridge. The Boggy bridge was between nine hundred and one thousand yards distant from the widow Pierson's house. Witness had often heard shooting on that road at night. It was generally done by parties coming from town overloaded with "busthead." The floor of the Boggy bridge was from twelve to fifteen feet above the bed of the creek, and was from thirty to forty feet long. The watch used at the widow Pierson's was only used to reckon time for medicine, and was not running on correct time.

Fritz Odenheimer testified, for the State, that the house in which he lived on the sixteenth day of March, 1885, was situated just ninety feet from the bridge over Boggy creek. Just as the witness got undressed for bed, on the night of the said day, he heard some shooting. The first shot was followed by a brief interval, and then by four shots fired in rapid succession. At the first shot witness opened his door, looked out, and saw the flashes of the last four shots. Witness was not expert enough to be able to say whether the four shots were fired from the same or different pistols. The shots were fired on the north side of Boggy creek, not far from the gate leading into the Moore farm, and between that gate and the bridge. The first shot was followed by cries for help, and after the last of the four shots were fired, witness heard horses crossing the bridge in a run, coming towards witness's house. Witness thought at first that but two horses crossed the bridge, but soon ascertained that there were three. Witness saw one of the horses stop at his gate. He afterwards caught and tied that horse, and identified him as Doctor Stovall's horse. About the time that Stovall's horse stopped, two men passed witness's house as fast as their horses could carry them. One of the men said: "Let us ride, for God's sake; we have no time to lose." When the remark was made, the men were not exceeding seven yards from witness's gate, which was not exceeding five yards from the door in which witness was standing. The limb of an elm tree turned the road from witness's fence at that point. Witness's fence formed one side of the road or lane. The two men described were running their

horses at full speed towards Onion creek and Wade Smith's store. After the men passed, witness went to Felix Smith's house, and sent two men to saddle horses to follow the men who fled by his house, as stated. He took Jasper Grindstaff with him to the place of the shooting. First, witness ran to Mr. Felix Smith's house, thence back, thence to the big gate, and from the big gate to the point where he caught and tied Doctor Stovall's horse. Witness did not know then who had been shot. Witness went on to the place of the shooting, and thence to Gagnan's house, reaching the house just as Doctor Stovall was being taken in. Witness looked at Gagnan's clock, and saw that it was just fifteen minutes before ten o'clock by that time piece as Doctor Stovall was taken into the house.

Felix Smith's house was three hundred and fifty yards distant from witness's house. Witness ran that distance as rapidly as he could. Witness left White Bill Johnson and Pat Cain to saddle the horses at Felix Smith's, and took Grindstaff with him to the place of the shooting. Witness and Grindstaff ran their best, stopping to tie Doctor Stovall's horse, and walking across the bridge. As witness and Grindstaff approached the place of the shooting they saw lights going from Gagnan's house towards the point where Doctor Stovall was said to have been found. From witness's house to the big gate, by way of Smith's house, the distance is about two hundred and fifty yards; from the bridge to Gagnan's gate the distance is about two hundred yards; from the gate to the house, seventy-five yards. Not more than fifteen minutes elapsed after witness left his house until he reached Gagnan's house. From Gagnan's house witness went to his fence, got on Doctor Stovall's horse, and rode to the big gate where he found saddled horses waiting for him. Witness sent Bill Johnson on a mule to inform Mrs. Stovall of the shooting of her husband, and took Grindstaff and Cain with him to Wade Smith's store. Doctor Davidson and Wade Smith went to Gagnan's house to see Dr. Stovall. Witness then went to the house of Medairis, thinking he was a justice of the peace, but on arrival ascertained that he was not such an officer. Witness borrowed a pistol from Medairis and rode back through Jim Smith's field by way of the house of the defendant. Witness got Colver, one of Felix Smith's tenants, to go with him, his party then consisting of witness, Colver, Grindstaff and Cain. The parties concealed themselves among some trees, not farther than one hundred and fifty yards from defendant's house, their

object being to apprehend defendant on his way home. The parties remained concealed among the trees about three quarters of an hour, making no discoveries. When witness and his party took their concealed position among the trees, an hour, or perhaps more, had elapsed since the two men passed witness's house going south. From the trees near defendant's house to Medairis's house the distance was about a mile. The trees mentioned were not more than a quarter of a mile distant from Wade Smith's store. To get to those trees the witness and his party went through Wade Smith's gate, into and through a corn and oat field. They went to the trees understanding that Wade Smith was to join them there, and go to defendant's house to see if he was at home. For some reason Wade Smith failed to join the party. The character of the night is best described by stating that, on their return from Smith's store, the party could distinctly see a party of fishermen traveling ahead of them at a distance of one hundred and fifty yards. It was a starlight night. Witness and his party overhauled the fishing party and informed them that Doctor Stovall had been shot, and they, in turn, informed Doctor Stovall's son-in-law, Smith. The fishing party numbered five or six persons. Witness overtook them about a quarter of a mile beyond Wade Smith's store, traveling in a walk.

Cross-examined, the witness said that they made no discoveries about defendant's house while secreted among the trees. They saw nor heard nothing. They did not hear any person approach the house, nor was a light struck in the house while witness and his party were watching. From the trees near defendant's house, witness went back to Gagnan's house. He did not then notice Gagnan's clock. Witness did not go into Gagnan's house that time. On his arrival at Wade Smith's store, witness found Wade Smith, Doctor Davidson, Perkins and Hart together in the "Boys' Ranch." The light shining from the "Boys' Ranch," after the door was open, did not strike witness, Grindstaff and Cain. Grindstaff and Cain did not dismount from their horses. Witness went into the house—the "Boys' Ranch"—to inform Smith of the tragedy, and immediately went back to his horse, and Smith went to the lot to saddle his horse, Doctor Davidson going with him. Witness, Grindstaff and Cain went to Medairis's in a gallop, staying about five minutes, just long enough to get a pistol. Witness stopped at Colver's not exceeding a minute, but rode directly through the field to the trees

near defendant's house. From the gate to the trees the party rode in a walk, accomplishing the distance in about five minutes. Witness had undressed to go to bed when the first shot was fired, but, having no time piece, could not give the exact time. The witness's door was closed when the first shot was fired. He had a lighted lamp in his house, but no fire. The two men passed the witness at a distance not exceeding six yards. Witness, however, did not recognize the men, nor was he able to distinguish the color of their horses. Witness's eyesight at best, was not very good. At a later hour, witness saw the fishing party at a distance of one hundred and fifty yards, but could not then distinguish the color of either the men or their horses.

M. D. Gagnan testified, for the State, that during March, 1885, he lived on the Moore farm, on the Austin and Lockhart road. The house stood at a distance of about one hundred yards from the road. Witness went to his own place, on Bear creek, about nine miles west of where he was living, on the sixteenth day of March, 1885. Witness left his place on Bear creek a little before sundown, and riding in a walk, arrived at home, he thought, about nine o'clock. Arriving at home, witness put up his horse, went into his kitchen and ate supper, his family having already eaten. There were in the house, besides the witness, at that time, the witness's wife and children and two hired hands, named Felix Wiley and Ben Tomberlin. While filling his pipe, after having finished his supper, the witness heard some shooting. Two shots were first fired, one instantly after the first. Witness stepped to his gallery and heard two more shots, and a cry for help. Witness called to Wiley and Tomberlin that somebody was hurt, and directed them to go with him to see what could be done. Witness's wife complained that she was afraid to be left alone, and witness drected one of the men to remain with her, and the other to go with him. Witness then went towards the point where the shooting occurred, and en route heard his name called. Witness called back in reply: "Who is it?" The answer was: "Doctor Stovall." Witness went in a run to the point where Doctor Stovall lay, which was about one hundred and twenty yards from witness's house. From the time that witness left his house going towards the shooting, until he was told who was shot, not above five minutes had elapsed.

At this point the defense examined the witness with the view of determining whether or not objection to the statement of the

deceased would be interposed.  The witness testified as follows: "From the time I heard the shots until I first stopped, I did not see anybody on the ground other than Doctor Stovall.  While I was standing outside calling the men (Wiley and Tomberlin) I heard some horses go across the bridge.  When I called out to know who was calling my name, I stopped, but it was merely a halt, and then I went right on.  I did not know who it was until I was answered that it was Doctor Stovall.  Before that I was merely running to the aid of the sufferer, whoever he might be.  At that time we had gone about two-thirds of the way.  We went with all our might from the beginning.  When we reached Doctor Stovall I was in front, and had the lantern. The conversation took place between him and me as soon as I reached him.  When I got in the vicinity of Doctor Stovall, I neither saw nor heard any one."

Resuming his testimony in chief, the witness repeated his account of his movements from the time he heard the shooting until he reached Doctor Stovall.  Doctor Stovall's first remark, after the witness reached him, was:  "Mr. Gagnan, I am shot." Witness asked:  "Do you know who did the shooting?"  Defendant's objection being overruled, the witness stated that Doctor Stovall's reply was:  "Tom Pierson."  Witness, being uncertain as to which Tom Pierson he meant, asked him: "Young Tom?"  Doctor Stovall replied:  "Old Tom (defendant) and Bob."  Defendant had two nephews named Tom Pierson. An effort to remove Doctor Stovall into the house by hand proving ineffectual, witness sent Tomberlin to the house for a cot, on which Doctor Stovall was placed and taken into the house.  Doctor Stovall died in the witness's house two days later, and his body was taken home for interment.  It was just fifteen minutes to ten o'clock when Doctor Stovall was carried across the threshold into the house.  Witness's clock indicated that hour, and the clock was running on city time, and was very near, if not quite, correct.  Witness sent for Doctor Stovall's family that night, but was unable to say at what hour they arrived.  William Smith and wife, the daughter of Doctor Stovall, arrived at witness's house later.  The night of the assassination was not a moonlight night.  Witness was after night getting home, and had it been too dark to see, he would have found it impossible to distinguish his way over the trails and through the gates he had to pass between Manchaca and home.

Cross-examined, the witness stated that his horse had often

traveled over the route from where he was living to his place on Bear creek, and he supposed knew the route from one point to the other. Witness guided the horse that night, and kept him on the direct route home. The horse ridden by witness on that night was a very rapid walker. Witness started from Bear creek, nine miles distant, about thirty minutes before sundown, stopping on the way only long enough to open and shut gates. The first thing witness did on getting home was to feed his horse at the stable, about thirty steps from the house, occupying about ten minutes in the task. He then ate supper, and was filling his pipe to smoke when the first shot was fired. Witness was not exceeding ten or fifteen minutes eating his supper. Witness noticed a few light clouds passing overhead at intervals as he was riding home. He took no notice of the sky after looking at the clock as Doctor Stovall was taken into the house. Doctor Stovall was placed on the cot by witness, Wiley and Tomberlin. The two latter bore the cot with the doctor on it into the house, and the witness carried the lantern. The cot was carried very slowly and carefully, two or three rests being taken en route to the house. Odenheimer reached witness's house before Doctor Stovall, in the hands of Wiley and Tomberlin, reached the house. Doctor Stovall was undressed at witness's house. Neither weapons nor spectacles were found on his person.

The testimony of Ben Tomberlin and Doctor R. M. Swearingen, though recited somewhat more in detail than on the trial of Bob Pierson, was in substance and effect a repetition of their evidence in the former case. (See 18 Texas Ct. App., 542–4.)

Justice of the peace William Von Rosenberg, jr., testified, for the State, that on the night of March 16, 1885, he was notified to go to Gagnan's house and take the dying declarations of Doctor Stovall. Witness found Doctor Stovall lying on a cot in Mr. Gagnan's house. Upon his arrival, the witness read to Doctor Stovall a document drawn up by him in accordance with the statute, which document reads as follows:

"STATE OF TEXAS, }
"County of Travis. }

"I, James C. Stovall, in making this, my declaration, am conscious of approaching death, and believe there is no hope of recovery.

"That this declaration is voluntarily made by me, and not through the persuasion of any person.

"That this declaration is not made in answer to interrogatories, calculated to lead me to make any particular statement.

"That I am of sane mind at the time of making this declaration."

The defense objected to the written statement as evidence, because it was in the nature of answers to written questions calculated to lead the deceased to make particular statements. The objection was overruled, and the witness, resuming his testimony, said that Doctor Stovall first said that he did not know whether he had any hopes of recovery or not. Witness did not take his statement immediately after reading the paper to him. Deceased asked witness to wait a short while, and witness walked out of the room. He was several times driven back into the room by the prevailing cold. Finally Doctor Stovall sent for the witness, and as the witness stepped into the room, he looked at witness and said: "Rosenberg, I cannot live, and I want to make my statement." As the witness sat down by his bed to write at his dictation, Doctor Stovall asked to see the document, as far as it was then written. Having read it, Doctor Stovall then proceeded to make his statement, and witness wrote it down, in pencil, word for word as it fell from his lips. He wrote it on the same paper, under the writing in ink, as read to him. Having finished transcribing his statement, the witness, as requested, handed the paper to Doctor Stovall, who proceeded to read it in its entirety. He then signed and returned the paper to the witness, with the remark that it was "all right." In the opinion of the witness, Doctor Stovall was perfectly rational and conscious when he made the statement. This all occurred on the morning of March 17, 1885.

Cross-examined, the witness stated that he reached Gagnan's house about four o'clock on the morning of March 17, 1885, and remained there about two hours before taking Doctor Stovall's dying statement. Several persons, including Doctor Stovall's wife, his son Gib Stovall, and wife, were present when witness took the statement down. Gib Stovall attested the signature of the deceased.

The State then offered in evidence that part of the instrument written in pencil, which included only Doctor Stovall's statement, but not that part written in ink. The defense objected

because "the statutory matter necessary was given by the witness to the wounded man, and was returned by the wounded man to the declaration taken, just as delivered by him; because there was no proof that Doctor Stovall was of the conviction that he was on the point of dissolution." The court overruled the objection, and the statement was read, as follows:

"It was Tom Pierson that shot me, while I was on my return from Felix Smith's, last night. Bob Pierson was with him. Tom was riding a sorrel blaze face horse. They had no occasion to shoot me. I had not spoken to them a word, nor had I done anything to either of them. I was just murdered by them.

"J. C. STOVALL.
"Witness:  G. C. STOVALL."

John C. and John H. Tulk, father and son, testifying for the State, said that they had known Doctor Stovall intimately for eight or nine years. They had often seen him read and write, both in the daytime and during the late hours of night, but had never seen him use spectacles.

John Wallace testified, for the State, that in March, 1885, he lived on the San Antonio road, about a mile or a mile and a half distant from Gagnan's house. Witness heard several shots fired in the direction of Gagnan's house on the night of March 16. The shots were fired while witness was at his lot turning his horses into the pasture. It was a bright starlight night. It was light enough to enable the witness to distinguish his bay from his sorrel horse. One of those horses was larger than the other. It might have been impossible for an ordinary eyesight to distinguish a bay from a sorrel horse, but the white face of a horse could be easily seen.

Mrs. Mary Stovall, the widow of the deceased, and Mrs. Novie J. S. Smith, his daughter, testified, for the State, that the eyesight of the deceased was very good, both by day and night, and that he had never worn spectacles.

Madison Wells testified, for the State, that his wife and defendant were second or third cousins. Defendant was at witness's house on the first of January, 1885, and stayed over night. In the course of a conversation into which Doctor Stovall's name was introduced, the defendant said: "The doctor left so much medicine for Mr. Davis we could not give it all. We threw all of Doctor Stovall's medicine into the fire, and gave Davidson's

medicine." He said further that some time before he met Doctor Stovall on the streets of Austin, and felt very much like "bucking" him.

W. W. Hornsby testified, for the State, that he was a brother to sheriff M. M. Hornsby, and was a deputy sheriff of Travis county. Witness was not in Austin when defendant was put in jail, but found him in jail when he, witness, took his position as deputy sheriff. Defendant broke out of jail in August, 1885. Witness's father was jailer at the time. Witness was in the office when defendant got out of jail. He heard his father give the alarm. He ran immediately to the large gate, and saw defendant escaping.

Tom Pierson, jr., testified, for the State, that he was a son of Bob Pierson, the defendant's co-defendant, and was a nephew of the defendant. In March, 1885, witness lived with his father at Pilot Knob. The distance, by roads, between the houses of Bob Pierson and the defendant was from three and a half to four miles. Witness's father sat up with the sick at the widow Pierson's on the night of Sunday, March 15, 1885. The witness spent that night at home, and John Pierson, the defendant's son, stayed with him. Witness, his brother Bob and John Pierson went to the widow Pierson's house on Monday evening, March 16. Neither the defendant nor old Bob Pierson were then there. Old Bob Pierson was at the defendant's house on Monday evening, but did not remain there all night. Witness stayed at defendant's house all of Monday night, with John Pierson. Witness knew Doctor Stovall in his life time. The witness, on the fatal Monday night, heard the defendant tell his wife that he and Lee Leverton had shot Doctor Stovall. Witness saw the defendant when the latter left his house with Leverton. Leverton rode up to the house between eight and nine o'clock that night, called to defendant, and said: "Let's go to see the sick folks to-night." Defendant replied to Leverton that he would be out in a minute. His blaze faced sorrel horse was then standing at the fence, bridled and saddled. Leverton was riding a bald faced sorrel horse. Defendant presently left the house, got on his horse and rode off with Leverton, traveling the route which led through Gagnan's place. There were three ways of going to the defendant's house from the neighborhood of the widow Pierson's house. One was to go through the Schaeffer and Gagnan places; another was to go through the Moore field, and another was to go through Felix Smith's bottom pasture. Leverton and

defendant came back to the defendant's house within an hour or an hour and a half. Witness was in the defendant's house at that time. Defendant told Leverton to go back up the turn row, the way he had come, and to ride. Leverton left in a gallop. Leverton and defendant were brothers-in-law.

Old Bob Pierson, witness's father, left the defendant's house on that Monday evening about thirty minutes before sunset, saying that he was going home. Witness's brother Bob left defendant's house less than fifteen minutes before his father did. Witness saw nothing more of his father or brother Bob that night. Defendant and Leverton were gone about one and a half or one and three quarters of an hour on their ostensible visit to the sick at the widow Pierson's house. Witness was at the defendant's house when the defendant, a little before sundown, came home. Defendant soon after his arrival at home went to J. Woods Smith's house. He started to Smith's between sundown and dark, and was gone perhaps an hour, but not longer. Witness ate supper that night with the defendant and his family. Supper was served about eight o'clock, and just as the defendant entered the house on his return from Woods Smith's. Leverton came within thirty minutes after supper. There was no timepiece in the house, and witness could only guess at the time. Defendant was arrested on the next morning by officer Thorp. Wade Smith and Pat Cain were present, and it may be that other persons were concealed behind the bluff. Witness was in bed when he heard the defendant tell his wife that he and Leverton had shot Doctor Stovall. Defendant and witness had conversed about Doctor Stovall. Witness did not tell the officers, on the morning of the defendant's arrest, what he knew about the killing of Doctor Stovall. They asked him nothing about it.

Cross-examined, the witness testified, that his father, Bob Pierson, was tried at the previous term of court for the murder of Doctor Stovall. Witness was in Travis county from the time of his father's arrest until final sentence was passed upon him. The witness was the party who made the complaint charging Lee Leverton with complicity in the murder of Doctor Stovall. He made that complaint on the thirteenth day of July, 1885. Witness knew no more of the facts connected with the killing of Doctor Stovall on the thirteenth day of July, than he did on the night of March 16, 1885. Witness made the complaint against Leverton because he was satisfied from what he heard at defendant's house on the night of the shooting, that Leverton

was a party to the assassination. Witness delayed making
complaint because defendant told him, witness, that he had to
swear that he, defendant, did not leave his house on the night
of Monday, March 16, 1885. Moreover, witness thought that, if
his father, innocent, was to be punished, then the guilty parties
ought to be punished. Witness thought the thirteenth day of
July was quite as good as any day upon which to make com-
plaint. Witness talked to his father about making the complaint
a month or two before his case was affirmed on appeal. He
talked to sheriff Hornsby about it on July 12, the day before he
filed the complaint. All of the facts connecting Leverton and
the defendant with the murder of Doctor Stovall the witness
kept to himself throughout his father's trial for the same offense.
Witness knew nothing about law at that time. Witness did not
tell Messrs. Walton and Sneed any of the facts when his father's
motion for a new trial was pending, simply because the said at-
torneys said nothing to him about new evidence. Defendant
told witness that he had to swear that he, defendant, did not
leave his house on the fatal Monday night, and witness thought
he had to swear to that effect. Witness's father, Bob Pierson,
was entirely innocent of complicity in the murder of Doctor
Stovall.

The witness saw and talked with J. Woods Smith on the morn-
ing of March 17, 1885, both at his house and in Wade Smith's
field. Witness told Woods Smith that the defendant, after he
got home from his, Smith's, house, on the night before, ate sup-
per, went to bed, and did not leave his house while witness was
awake. Woods Smith made an earnest appeal to the witness to
tell the truth. What witness told him in reply was utterly
false. Witness did not tell Smith the truth, because he was un-
der orders from the defendant not to tell the truth. At the time
of the witness's conversation with Woods Smith, the defendant
was in custody. Witness admitted that he told defendant's
counsel, Major Walton and Captain Sneed, a few days before
the trial of Bob Pierson, that defendant did not leave his house
on the fatal night after he returned from Woods Smith's house.
Witness made that statement to the attorneys because the de-
fendant had told him that he had to swear to that effect. The
witness had never, until now, corrected that statement, falsely
made to the attorneys named. Witness was in the defendant's
house from sunset on the evening of March 16, 1885, until sun-
rise the next morning. Witness spent perhaps a half hour in

the field on the evening of the sixteenth, trying to catch a loose horse. John Pierson was with him. Witness returned from his chase of the horse before defendant got back from Woods Smith's house. It was not then eight o'clock, nor was the witness away from the defendant's house at eight o'clock. The horse chased by the witness was a sorrel blaze faced animal. The said horse was still in the field on the next morning, and Mr. Hornsby, Tulk and Peck drove him to the lot. Bob Pierson, the witness's father, rode a sorrel blaze faced horse to defendant's house on the evening of March 16, and, as stated, left defendant's house to go home about thirty minutes before sundown. Leverton reached defendant's house within thirty minutes after supper was over, and between eight and nine o'clock. From defendant's house to the point where Doctor Stovall was shot the distance, on a line, or "straight through," was about three quarters of a mile. John Pierson unsaddled and fed defendant's horse when he came home on the fatal evening, but that horse was standing at the fence, saddled and bridled, when Leverton reached the house between eight and nine o'clock. Witness admitted that he told Major Walton that the defendant's horse was put up after he returned home in the evening, and was not caught again that night, but that statement was false. Witness claimed that he stated before Von Rosenberg's court that all he was ordered by the defendant to swear was that the defendant did not leave home on the night of March 16, 1885. The witness first told his father what the defendant required him to swear, about a month before his father's appeal was disposed of in the Court of Appeals. Hornsby was the next person the witness told.

Leverton stayed no longer at the defendant's house when he came after him on the fatal night, than for the defendant to get his hat, mount his horse and ride off. Defendant was sitting in the house by the fire when Leverton rode up. The witness saw no arms on either Leverton or the defendant. Witness walked to the door with the defendant, who said that he was going to the widow Pierson's house to sit up with the sick couple. Leverton was then between fifteen and twenty-five feet from the door. It was light enough for the witness to see, and he did see and recognize him. Leverton's horse was headed north, and he and defendant rode off together in a trot. Witness saw them until they got through and beyond a gate, some thirty steps from the house. He then went back into the house, and joined

defendant's wife and his four children. They sat by the fire talking and examining some photographs until the defendant returned, an hour or an hour and a half later. Defendant sat by the fire a few minutes after his return, and then undressed and went to bed. Defendant had no arms then that witness saw. All of the members of the defendant's family sat up during the absence of the defendant, and if any of them left the room during that time the witness did not know it. Witness went to bed a few minutes after the defendant did. Defendant was not talking when the witness laid down, but witness did not think he was asleep. Witness and John Pierson occupied the same bed, but witness did not know which of the two went to sleep first. The night of March 16, 1885, was a starlight night, with occasional gulf clouds passing overhead. Witness knew the country delineated in the diagram quite well, and, if on foot, could go anywhere over its roads or through the bottoms. On July 13, 1885, the witness determined to recant the falsehoods he had told Mr. Woods Smith, Major Walton and Captain Sneed. Witness's father was to start to the penitentiary on the next day, and was informed of the witness's purpose to recant. What witness did in the premises he did of his own volition, uninfluced by any person. He told his father that he was going to make the complaint against Leverton, and his father replied: "All right; go ahead."

On his re-direct examination, the witness testified that Major Walton and Captain Sneed examined him as a witness on the trial of his father. They asked the witness on that trial nothing about the whereabouts of the defendant and Bob Pierson on the night of the shooting. They confined their inquiries to the whereabouts of witness, defendant and Bob Pierson on Saturday, Saturday night, Sunday and Sunday night. The false statements made by witness to Messrs. Walton and Sneed were made by him in Major Walton's office. Witness knew then that they were trying to prove an *alibi* for the defendant and Bob Pierson. Witness at no time knew that Walton and Sneed desired new testimony tending to acquit Bob Pierson and convict the defendant. Witness did not think that they wanted testimony against either Bob Pierson or the defendant. Witness had never sworn on the stand to the truth of any of the false statements made by him to Woods Smith, Walton and Sneed. Witness could not swear positively to the particular whereabouts of his father on the fatal Monday night. He left defendant's

house to go home, and witness stayed at defendant's house and saw no more of him on that night.   The State rested.

Doctor Q. C. Smith testified, for the defense, that some time in January, 1885, he was called to the house of Mr. Robert Throgden to see a sick child, and there met Doctor Stovall.   Mr. Throgden appeared somewhat displeased with Doctor Stovall for failing to attend the child when sent for on the night before. Doctor Stovall stated, in excuse, that he did not get home until late in the night, and could not see well enough at night to travel with safety to himself, mentioning in the same connection that, a short time before, traveling at night, he lost his way in a neighbor's pasture.   He spoke as though his vision had but recently become impaired.   As near as witness could repeat them, his words were: " I have got so of late that I cannot see well at night."   He remarked that, returning from the neighborhood of Oatmanville on the night before, he got lost and did not reach home until two o'clock. . This witness was corroborated by Mr. Throgden.

J. L. Jones testified, for the defense, that he was at Wade Smith's store on the evening before the tragedy.   He met and conversed with the defendant and Perkins, near a small house behind the store.   He was not inside of Smith's store while defendant was in there.   He did not hear the defendant speak of, mention or allude to Doctor Stovall on that evening.   Witness at no time that evening saw defendant in conversation with either Doctor Davidson, Wade Smith, Ben Magness or a colored man.

Mrs. Nancy Rose, Mrs. Bob Pierson's sister, testified, for the defense, that Doctor Stovall visited a sick child at her house during the winter of 1884-5, and on that occasion used a pair of spectacles, owned and used by witness and her husband, to examine the register of a fever tester.   He used the same spectacles on the same occasion to examine the record of the tester kept by witness's nephew on a piece of paper, written with a pencil, and by her husband written with a piece of chalk over the fire place.   Witness had seen Doctor Stovall use those same spectacles as many as three times.

William M. Davis testified, for the defense, that Bob Pierson's wife was his sister.   Witness's wife was a daughter of the widow Pierson.   Witness spent the night of Saturday, March 14, 1885, at the house of the widow Pierson, and left there at about eleven o'clock on Sunday morning.   Defendant came to

the widow Pierson's about eight o'clock on that Sunday morn-
ing. He sat down near 'Shack's sick bed, and asked Mrs. Pier-
son how 'Shack was getting on. Mrs. Pierson replied that she
thought him a little better. Defendant and witness then left
the room, leaving 'Shack asleep. After a short time Mrs. Pier-
son came to the room into which witness and defendant had
gone, and told defendant that 'Shack had waked up and wanted
to see him. Witness followed defendant back into 'Shack's
room. 'Shack told defendant that he wanted another doctor.
Defendant making no immediate reply, 'Shack asked him: "Will
you get me another doctor?" Defendant replied: "I can go
and get another doctor for you in town, 'Shack. I can get you
Doctor Morris, Doctor Cummings or Doctor Taylor. They are
the only doctors in town ·I know." Mrs. Pierson said: "No;
get that doctor (Bennett) William Davis (witness) had with his
son." Witness then said: "No; we had bad luck with him; get
some other doctor." Mrs. Pierson said nothing more, and de-
fendant bridled his horse and rode. off towards town. Doctor
Stovall attended a sick child at Rose's house during the winter
of 1884-5. Witness saw Doctor Stovall use spectacles at Rose's
house to examine the record of a fever tester, written on paper.
Witness never saw Doctor Stovall use spectacles but once to look
at the record, and speaking to him about it then, Doctor Stovall
said that he had not used spectacles often.

W. W. Perkins testified, for the defense, that he saw and con-
versed with defendant at Wade Smith's store on the evening of
the fatal Monday. The witness had never in his life heard de-
fendant mention Doctor Stovall's name.

W. T. Hart testified, for the defense, that he saw defendant at
Wade Smith's store on the evening of March 16, 1885, but ex-
changed only a word with him. He did not hear defendant
mention Doctor Stovall's name. He saw defendant talking with
Doctor Davidson and Ben Magness, on Wade Smith's gallery,
but did not know what passed between them.

The widow Pierson's son Tom testified, for the defense, that
he was the nephew of the defendant. For a week or ten days
prior to the assassination of Doctor Stovall, the witness had
been absent from home, but got home on the evening of the
tragedy about thirty minutes before sunset. Witness went home
by way of Austin. Tom Titus and Bud Douglass went to Austin
with him. Witness saw the defendant and old Bob Pierson in
Austin, but nothing more than an ordinary greeting took place

between them and the witness. They said nothing more to witness than that his brother 'Shack was very sick, and that he had better hasten home.

Cross-examined, the witness testified that he heard the shooting at the time Doctor Stovall was fired upon. Witness counted three shots fired down the Lockhart road near the Boggy bridge. Witness did not recognize the reports as those of any pistol he knew. He heard as many as two horses run across Boggy bridge, and as many as two more running down the road towards the witness's mother's house. Witness and Black Bill Johnson ran from the house to the road for the purpose of seeing the parties on the horses as they passed. The horses, however, were stopped near George Rose's pasture gate, and witness heard them no more.

Al. Gooden testified, for the defense, that he was out from his house on the night of the tragedy. He started to the house of Calvin Hughes, but between seven and eight o'clock met Hughes about three hundred yards north of the Lockhart road, and about five miles south of Bluff Springs. Witness and Hughes stopped at that point a long time in conversation. The night was so dark and foggy that the witness could not distinguish the form of an intimate friend at a greater distance than forty feet, and could not distinguish the features at all.

Cross-examined, the witness testified that he got back home about nine o'clock. He and Hughes met in a hollow, the hills on either side of which were of considerable dimensions. The hollow formed a ravine. Witness recognized Hughes at a distance of twenty-five feet, but only by his voice. Witness, describing the character of the night, referred to it as it appeared from the hollow. He paid no attention to the nature of the night on the prairie. Witness rode part and walked part of the way to the place where he met Hughes. He rode a different horse back home. He would not have known of the presence of that horse in the hollow had not the animal snorted.

S. J. Hughes testified that it was quite dark between eight and nine o'clock on the night of March 16, 1885.

James Woods Smith testified, for the defense, that the defendant, who lived about one thousand yards from him, came to his house on the night of Monday, March 16, 1885, reaching there just at dark, a few minutes before eight o'clock. He remained there between three quarters of an hour and an hour, leaving at thirty or forty-five minutes past eight o'clock. Witness saw

young Tom Pierson, the son of old Bob Pierson, who testified in this case, on the next morning after Doctor Stovall was shot. In reply to questions propounded by the witness, young Tom said repeatedly that defendant remained at his home throughout the night after his return from witness's house; did not leave it at all; and that no person came to the defendant's house during that night, so far as he knew.

Cross-examined, the witness said that he had no recollection of stating to Henry Hirshfield, in Austin, three or four days after the shooting of Doctor Stovall, that defendant reached his house before dark and between seven and eight o'clock, and left at eight o'clock. Witness did not know at what hour the shooting of Doctor Stovall took place. Witness may have said to Hirshfield that defendant was at his house too early in the night for the witness's testimony to be of any use to him in establishing an *alibi*. Witness may possibly have said to Hirshfield that had defendant remained at his house as late as he usually did on night visits (until nine or ten o'clock), he might have been able to do him some good. Witness had no recollection of ever having talked with W. D. Miller about the defendant. He most certainly did not tell Miller, shortly after the shooting of Doctor Stovall, that defendant had ample time to walk to Austin and kill a man, between the time he left witness's house and the time Doctor Stovall was shot. Witness had no recollection of stating to Hart that the defendant came to his house about seven o'clock, or between sundown and dark. It was really dark, in the opinion of the witness, within thirty minutes after sunset. The last vestige of twilight had disappeared when the defendant reached witness's house. The night was a clear one.

On re-direct examination, the witness testified as follows: "Some evenings after Tom Pierson's visit to my house, I went and positioned myself under like circumstances, and estimated the time as well as I could, and then went and looked at the clock, and the clock marked eight when I went to the house. That was the time when Tom Pierson came. That night I did not see any horse that Tom Pierson was riding, tied out at the fence. He came to my house on foot, and left on foot. The road running near Tom Pierson's and through my pasture is a neighborhood road. When Tom Pierson left, he went in a direct line towards his home, and his route was across the plowed ground in the field."

Recross-examined, the witness testified that he met Felix Gat-

lin near the place of the shooting on the day after it occurred, but had no recollection of meeting him in a pasture. Witness may have then stated to Gatlin that defendant left his house about fifteen minutes before eight o'clock, but he had no recollection of having done so.

D. H. Gooden testified, for the defense, that his eyesight was very good. He remembered the nature of the night of March 16, 1885. Witness could distinguish on that night between a white and a dark horse, but not between a brown and a sorrel. On that night, in driving his four horses through his gate, witness readily distinguished his white horse, but could not tell his brown from his sorrels.

Jules Delfraise testified, for the defense, that defendant came to Woods Smith's house about dark, or between seven and eight o'clock, on the night of the tragedy. He remained between thirty and forty-five minutes, and left, as he came, on foot. Witness did not consult a timepiece. His estimate of the time was purely guess work.

Mrs. Polly Leverton testified, for the defense, that she was the wife of Lee Leverton. She had known Doctor Stovall about one year at the time of his death. The witness heard of the shooting of Doctor Stovall on the morning after it occurred. Doctor Stovall was said to have been shot at a point about a mile distant from witness's house. Witness's husband was not in the habit of leaving home, particularly at night, except when compelled. He sat up one night with the sick at the widow Pierson's, after Doctor Stovall's death. Four or five weeks before that he sat up one night with Davis's sick child. Those were the only two nights he had spent away from home since December, 1884. Witness and her husband had been married twenty-five years. Her husband was a man of weak constitution, and had not run about any since his marriage. He was billious on the sixteenth day of March, 1885, and was taking medicine. Witness's husband was away from home so seldom that witness could readily recall his absences. After Doctor Stovall's death he sat up one night with 'Shack Pierson, and another night he sat up with the corpse of a young lady. Witness's husband went across the creek after his horses on the evening of March 16, 1885, and was complaining then, but he was not away from his home at any time after dark on that night. Everything that happened at her house on that night was fresh in her mind when, early on the next morning, witness

heard of the shooting of Doctor Stovall, and the arrest of defendant and Bob Pierson. Witness and Martha Pierson, now Mrs. Edwards, went to see the sick at the widow Pierson's on March 16, 1885. From defendant's house they went through the bottom by Gagnan's, the distance being about one and a half miles, and returned the same way. Witness's sons, William and Silas, were chopping wood in Jim Smith's bottom on that day. Witness did not see them as she went to or came from the widow Pierson's, but they came home between sundown and dark. Witness got home about thirty minutes before sunset, and found her husband awaiting her. Witness and her husband retired very early, neither being well.

Cross-examined, witness testified that the defendant was her twin brother. Witness saw her brothers, the defendant and Bob Pierson, at the widow Pierson's, on the evening of March 16, 1885. Defendant told witness that he was going by witness's house, to see if witness's husband could sit up with the sick that night. Witness told him that her husband was sick, but that he could go by and see him. Defendant replied that he would go by. Martha Pierson, defendant's daughter, was then with the witness. Nothing was said about her sitting up. Returning home by way of defendant's house, witness saw her brother Bob at the defendant's house. Witness stopped but a moment, and continued her way home by way of Gagnan's house and Wade Smith's store. She saw defendant on Wade Smith's gallery as she passed. The sun was then about thirty minutes high. Witness's husband then owned a sorrel blaze faced horse. He owned no other than a boy's saddle. Some time after the death of Doctor Stovall, witness's husband took a trip to Collin county to see his father. He went by rail and was gone a week and a day, and was arrested for complicity in the murder of Doctor Stovall about a week after he got home. Witness's husband started to Austin about a week before this trial, and got hurt. He was not in attendance upon this trial, but his deposition had been taken. Witness's husband was a sufferer from chronic fistula, and never rode horseback when it could be avoided.

The substance of the testimony of William and Silas Leverton was, that they got home from wood chopping between sundown and dark. Their father, Lee Leverton, was then at home, ate supper at dark, and shortly went to bed, and did not leave home during that night, so far as they knew.

Cross-examined, they testified, in substance, that they were at the defendant's house about thirty minutes before sunset on the fatal Monday evening. They found Bob Pierson and his sons, Tom and Bob, there. Old and young Bob left defendant's house a few minutes before the defendant got home. Defendant was riding a bald faced sorrel horse on that evening. Witnesses thought that horse was turned into the lot or the pasture upon the defendant's arrival.

Mrs. Martha Edwards testified, for the defense, that she was the daughter of the defendant. She married her husband, Mr. Edwards, since the trial of Bob Pierson. Defendant was arrested on the morning after Doctor Stovall was shot. Witness saw old Bob Pierson at her father's house twice on the night of the shooting. He and his son Bob first came to the defendant's house on that night between eight and nine o'clock. Young Bob and his brother Tom went off with him, in the direction of Gagnan's place. He returned in a gallop between nine and ten o'clock, and called to witness to shut off the dogs; that they were barking. Young Tom came back that night on foot, but witness saw no more of young Bob after he went off with his father. Witness spoke to old Bob Pierson after his and young Tom's return, and gave him a dipper with which to get drinking water from the barrel in the yard. He remarked to witness that he had eaten some fish for supper. The defendant spent part of Sunday, the day previous, sitting with the sick at the widow Pierson's, and in going to Austin for a doctor. He spent Sunday night also at the widow Pierson's. He left home about dark on Monday evening to go to Mr. Jim Woods Smith's. He was gone an hour, or perhaps a little longer. Supper was delayed until his return from Smith's. After eating supper, the defendant went into the sitting room, where he remained sitting for a while. He then retired. Witness had not finished clearing off the table and washing up the dishes when he went to bed. After cleaning the dishes, witness occupied herself until about ten o'clock examining some photographs brought to the house on the day before by the defendant. She then went to bed. Defendant, his wife, witness and three others of the children slept in the same room. Young Tom Pierson, returning a short time after his father (old Bob), came to the house the second time on that night, and remained all night. Old Bob Pierson was at the defendant's house on that evening, about thirty minutes before sunset. Young Bob left defendant's house on that evening a

very short time before old Bob did, both going towards old Bob's home. Both of them—old and young Bob—came back between eight and nine o'clock, when old Tom and both of his sons left, going in the direction of Gagnan's. Witness saw no more of young Bob, but old Bob came back to the house riding and young Tom walking, between nine and ten o'clock on that night. Young Tom stayed all night. Witness's cousins, Bill and Silas Leverton, were at defendant's house on the evening of the tragedy. On the Saturday previous to the shooting, witness was at the house of the widow Pierson. 'Shack sent a message by her to the defendant, which the witness delivered. He sent word for the defendant to come to see him, saying that he wanted another doctor. Defendant went to see 'Shack on Sunday, in response to that message.

Cross-examined, the witness testified that she saw her father, the defendant, and her uncle, Bob Pierson, her brother John, and cousins Tom and Bob, at the widow Pierson's on the afternoon of the fatal Monday. Witness and Mrs. Leverton reached Mrs. Pierson's about one o'clock on that afternoon. Witness reached home on her return when the sun was about one and a half hours high. Mrs. Leverton returned with witness. Bob Pierson and his son Bob were at defendant's house when witness got back home. Old Bob left when the sun was about thirty minutes high. Young Bob had then been gone about fifteen minutes. They both left on horseback, going in the same direction. William and Silas Leverton got to defendant's house after the witness got back from the widow Pierson's. Defendant got home about sundown. He did not eat supper until he got back from Mr. Woods Smith's. When old and young Bob returned to the defendant's house, between eight and nine o'clock on that night, they did not tell witness where they were then going, nor did the witness ask them. No one asked why they had come back, but old Bob volunteered the remark that he was going to see his sick nephew at the widow Pierson's. Young Tom's horse escaped from the lot to the field on Monday evening. He and witness's brother John attempted but failed to catch the horse, and returned to the house about an hour before old Bob and young Bob Pierson came back. Witness did not know whether or not the defendant's horse was away from home on that Monday night.

Witness knew before twelve o'clock on that night that Doctor Stovall had been shot. Defendant was arrested for the murder

of Doctor Stovall on the next morning by five men.   The witness
did not tell either of those men what she knew about the shoot-
ing of Doctor Stovall.   Witness knew nothing about the actual
shooting of Doctor Stovall.   She knew only what young Tom told
her about it when he came in.   She knew that the defendant had
nothing to do with it.   Witness did not protest her father's inno-
cence to the arresting party, nor did she tell them that she knew
who did the shooting.   She had never, previous to the Leverton
trial, told any one that her father was innocent, and that she
knew the guilty parties.   Old Bob Pierson was convicted before
the Leverton trial.   Nobody asked witness about her knowledge
of the facts, though people talked to her.   Witness told no one
what she knew until after old Bob's conviction and the arrest of
Leverton.   Witness was in attendance upon the court during
the proceedings for bail which followed the arrest of the defend-
ant and Bob Pierson.   She did not tell her father's lawyers
what she knew, simply because she did not want to tell them.
Defendant's case was set for trial two or three weeks after the
trial of old Bob, and witness attended court to testify, but did
not tell what she knew to her father's lawyers.

Re-examined, witness stated that she was asked only to answer
such questions as her father's lawyers propounded to her.
Young Tom Pierson told witness, when he came back to the
defendant's house, on the fatal night, that his father, old Bob Pier-
son, had shot Doctor Stovall.   He told witness also that he rode
the defendant's bald faced sorrel horse on that night.   Old Bob
was riding a horse of the same description when he left defend-
ant's house that night.   Defendant did not speak of Doctor Stovall
on the night of the shooting.   He did not tell those present in
his house on that night that they had to swear that he did not
leave the house during the night.   Defendant walked to and
from Woods Smith's house on that night.   Young Tom told wit-
ness that "her father's horse was at the killing of Doctor Stovall;"
that he "rode him there."   When old Bob came and told witness
to take the dogs in, the defendant had been home from Woods
Smith's about thirty minutes.   Defendant, his wife, and his son
John had gone to bed, but witness had not.   Old Bob did not
stop when he came by defendant's house the last time on that
night.   He passed right on in a gallop.   He had no hat on his
head.   He appeared to be in a great hurry.   Young Tom stopped
and stayed all night with the witness's brother John.

Mrs. Bettie Pierson, the wife of the defendant, was his next

witness. She testified substantially as did her daughter, Mrs. Edwards, as to the movements of the defendant from the time he got home late on Monday evening, until his arrest on Tuesday morning, except that she fixed the length of defendant's absence on his visit to Woods Smith's at about two hours. She corroborated her daughter as to the several calls at her house by old and young Bob and young Tom Pierson, and declared that, when old Bob passed her house the last time, between nine and ten o'clock, in evident haste, he was bare headed. She denied that the defendant, on that night, charged the members of his household to swear that he was not absent from his house during the night. He said nothing on that night about the shooting of Doctor Stovall.

On her cross-examination, the witness stated that she was lying down when old Bob Pierson passed her house the last time. She heard a horse running, raised the window, looked out and recognized him. She saw distinctly that he was bare headed. He passed the house at a distance of about twenty feet. A light in a chimneyless brass lamp was burning in the house, but it was not by the light of that lamp that she was enabled then to recognize old Bob Pierson. When old Bob passed the house the first time after night, he was joined by his son Tom. Witness did not see how young Tom went off or came back, but when he came in to go to bed he looked frightened. He (young Tom) said that his father had shot, or had killed, Doctor Stovall. He made that statement in the hearing of all the members of the family, except the defendant, who was asleep. No one asked him anything about the particulars. Witness did not awaken her husband to tell him of the trouble impending over his brother. Defendant knew nothing of the shooting of Doctor Stovall until constable Thorp, arresting him, told him. Defendant's saddle horse was a bald faced sorrel animal. There were three pistols in the defendant's house on the morning of his arrest, two of which would shoot. The other was used as a toy by the children.

Felix Smith, jr., the son of J. Woods Smith, testified, for the defense, that he went to his father's house some time after dark on the fatal Monday night. He found defendant and Woods Smith and Delfraise together in the horse lot. About thirty minutes later the defendant left on foot, going towards his home. A month, or perhaps a little more, after this meeting, witness's uncle, the Honorable Felix E. Smith, asked witness what

time defendant left Woods Smith's house on that Monday night. Witness replied that he had no time piece with him, and did not know; he did not say that defendant left there before eight o'clock.

"Black" Bill Johnson was the next witness for the defense. The important part of his testimony was to the effect that he was at the widow Pierson's house when the fatal shots were fired. He heard three shots fired, he thought, on the Lockhart road, near the Boggy bridge. Immediately after the shots were fired, witness heard the noise of horses running over the Boggy bridge. Those horses seemed to be traveling toward Austin. The horses seemed to stop near old man Rose's gate. Witness went to the road to get a sight of the men riding the horses, but they stopped before reaching the point opposite the widow Pierson's house, and he did not see them.

Cross-examined, the witness testified, that up to Sunday, March 15, 1885, the sick boy, 'Shack Pierson, had been in Doctor Stovall's charge. A change of doctors was made on Sunday, but witness did not know upon whose authority. On the trial of Bob Pierson, the witness testified that defendant and Bob Pierson discharged Doctor Stovall, and employed Doctor Cummings to take charge of 'Shack's case. Witness was so informed by the widow Pierson. When defendant left widow Pierson's, on Monday morning, he told witness not to let Doctor Stovall administer any medicine to 'Shack, but to tell him that he, defendant, had gone to town for medicine. Witness testified before the coroner's jury that Doctor Stovall was discharged without 'Shack's consent. Witness was so informed by the widow Pierson.

John Pierson, the son of the defendant, testified in his behalf. The witness spent the Sunday night prior to the shooting at the house of his uncle, Bob Pierson. Young Tom and young Bob Pierson and witness went to see 'Shack Pierson on Monday evening, March 16, 1885. Witness did not see either the defendant or old Bob Pierson at the widow Pierson's. Witness, with young Bob and Tom, got back to the witness's father's house about thirty minutes before sundown, and found old Bob Pierson at the house. Old Bob remained at the house of the defendant only about fifteen minutes after witness got home. He went home by the way of J. Woods Smith's house. Young Bob went home the same way, but left defendant's house about fifteen minutes before old Bob did. Defendant came home from Wade Smith's store about dusk, which was a short time after

old Bob left.   Defendant rode a blazed faced sorrel horse to and from Wade Smith's store.   When he came back witness put the horse in the lot and fed him.   A little after dusk defendant went to Woods Smith's house.   He went and came back on foot. Witness did not know how long defendant was absent on his visit to Woods Smith.   Old and young Bob came back to defendant's house while defendant was gone to Woods Smith's.  · Young Bob was riding his little black pony.   Old Bob was riding his sorrel horse known as "Gatling."   Witness's sister Martha (now Mrs. Edwards) gave old Bob a drink of water, after which old and young Bob and young Tom left, going off through Wade Smith's pasture.   Young Tom rode the defendant's blaze faced horse, his own horse being loose in the field.   The route over which they left led through Wade Smith's bars into Felix Smith's pasture, and thence through a gate into the Lockhart road.   Some time later witness saw young Tom and heard old Bob Pierson. The latter's horse came to the house in a lope, and witness heard him (old Bob) call to some one to put the dogs in the house.   Witness recognized old Bob by his voice.   Young Tom came into the house and spent the night with witness.   Defendant was then in bed.   Defendant, to the witness's knowledge, was not away from his house from the time that he returned home from Woods Smith's to the time old Bob passed in a lope, and young Tom came into the house and went to bed.

Cross examined, witness said that he turned his father's horse into the pasture after unsaddling and feeding him, on his return from Wade Smith's store.   Young Tom afterwards caught that horse at the pasture gate, mounted him and rode off with his father, old Bob Pierson.   Witness testified in Von Rosenberg's court on the Leverton examining trial.   The prosecuting counsel, referring to the written testimony of the witness on the Leverton examining trial (which witness admitted that he signed), asked witness if he did not swear on that trial that he "did not know whether old Bob or young Tom Pierson rode his father's horse away" from his father's house on that fatal Monday night?   The question was repeated several times, but the witness declined to answer it.   Witness declined to answer several other questions, based upon questions asked him and answers made by him on the Leverton examining trial.   Continuing, the witness testified that, when old Bob passed defendant's house, witness, defendant and his wife were in the middle room, and his sister Martha was in the west room.   Old Bob

Pierson passed by before young Tom came into the house. The cross examination of this witness proceeds as follows :

Question—"Let me ask you if you did not state on the Leverton trial as I read : 'Question—Did you go out there to see young Tom ? Answer—No ; but young Tom slipped in the house just as uncle Bob ran by.' Did you state that or not ? * * .* Do you want to answer it ?

Answer—"No. We did not eat supper until father came back from Jim (Woods) Smith's, and he ate supper with us. Nobody ate supper with us but our own folks.

Question—"Did you not on that same examination, when Justice Von Rosenberg was writing down the questions and answers, answer me as follows to my questions :

'Question—Did your father eat with you ? Answer—I do not think he did ?

Answer—"I do not think I said it.

Question—'Was he at Smith's when you were eating the snack ? Answer—No ; he had not come home then ?

Answer—"Yes, that's right.

Question—'Did the balance of the family eat supper with you ? Answer—Yes ; they all ate supper. Question—Did your father eat any supper at all. Answer—No, I think not.'

Answer—"I don't think I said it.

Question—'How long after you got through supper before your father came from Mr. Jim Smith's ? Answer—About an hour, I reckon.'

Answer—"That is not right; no, I did not. The questions and answers on the Leverton trial were written down, and after I had testified my testimony was read to me, and I signed it as correct. I never told any one before the arrest of Lee Leverton, on the complaint of young Tom Pierson, about uncle Bob and Tom returning to our house on that night. The first time I ever told it was in the court house during uncle Lee's trial, after I was sworn. That was some time after uncle Bob's trial. I don't know whether father's case was set for that same term or not. Father had had a trial on habeas corpus for bail, and I was present as a witness. Up to the time that my uncle Bob was tried and convicted, I had not told my father's attorneys, or anybody, about my uncle Bob, cousin Bob and cousin Tom having left my father's together on that night."

Re-examined, the witness testified as follows: "My statement now is, that my father took supper with the family that

night; that he was not there when the snack was eaten that evening, not having returned home at that time; that young Bob (Tom?) came into my father's house that night just after old Bob passed; that there was a light in the house when young Tom came in; that sister Martha and I were up when uncle Bob passed, she in the west room, I in the middle room; that she went to the door, and that I did not. I testified on the Leverton trial before Von Rosenberg that, when my father returned from Jim Smith's, he ate his supper, smoked his pipe and went to bed. There were two meals on that night, a snack and a supper."

Lee Leverton testified, for the defense, that he lived on the Lockart and Austin road, about one mile distant from the point where Doctor Stovall was shot. Witness first heard of the shooting about thirty minutes after sunrise on the morning of March 17, 1885. The witness was at home all of the preceding night. Defendant lived about three-quarters of a mile distant from the witness. Witness was not at defendant's house on Monday night, nor did he see the defendant after dark on that night. Defendant overtook witness on Monday evening at the Onion creek ford, where witness was talking to Mr. Bartlett. Witness, who was on foot, had been to the creek bottom to drive up his horses. Defendant, who was on horseback, rode up the hill with witness, and helped witness pen his horses. Witness invited defendant to get down and go into the house. Defendant replied that he was worried and would have to go home. Witness next saw the defendant in jail. On the Sunday evening before the killing, witness met the defendant in the turn row going towards Wade Smith's. He said that he was on his way to the widow Pierson's, to see 'Shack. Witness had known Doctor Stovall about a year at the time of his death, and for that time had been on perfectly friendly relations with him. From the first day of January, 1885, to March 16, 1885, witness was away from home at night not exceeding three or four times. Two of these nights witness sat up with the sick at Ben Davis's, and the other two were the nights he sat up with the sick at the widow Pierson's. Those nights, and a week in February which witness spent at Bob Pierson's quarrying rock, were the witness's only absences from home at night during the period mentioned. Witness was quite unwell on Monday, March 16, 1885, and for several days prior thereto had been taking pills. He remained at home all day of Monday, going nowhere except to drive up his horses late in the evening.

Cross-examined, the witness testified that Leff Davis married his daughter Hattie. Witness had an examining trial before Justice Von Rosenberg, upon the charge of being a party to the murder of Doctor Stovall. Leff Davis and his wife Hattie were in attendance upon that trial. The following colloquy ensued between the State's counsel and the witness:

Question—"Did you not state to Madison Wells at that time (time, locality, etc.. definitely fixed,) that Tom Pierson had five hundred dollars to give to any man that would make it appear that he, Tom, was on that side of the creek on the night that Doctor Stovall was killed?"

Answer—"I did not. I said that I was offered five hundred dollars to make it appear that I was at Tom Pierson's house on that night. The notaries public read my answers over to me, but I did not understand it the way you have stated it. I have stated it as it was."

Question—"Did not Madison Wells say: 'Why do you not make it appear, then, that Tom was on this side of the creek?' And did you not reply: 'I am watched too close, or I would?'"

Answer—"I did not."

Question—"Did you not, before the trial of Bob Pierson, say to Bill Davis: 'These boys keep sending for me to come to the jail to talk to them. I could do them no good. If I were to go up there and tell the truth, they would arrest me on the stand. I made up my mind, as I rode along the lane that night, that when I got to Doctor Stovall's I would not make myself known; that I would mumble out something. When I got there, I did mumble out something, but Mrs. Stovall set the dogs on me. After I rode down the lane I heard the shooting, and ran through the field?'"

Answer—"No, I did not, and nothing like it, at no time and at no place. I did not go to Doctor Stovall's that night to get him out so that Bob and Tom Pierson could kill him, and I ran through no field. I have sold my blaze faced sorrel mare. I went up to Collin county after that, to see my father. Bob and Tom Pierson are my brothers-in-law. I married their sister. That Monday evening Tom Pierson did not say anything to me about Doctor Stovall. We did not mention his name."

Re-examined, witness testified as follows: "What I said to Madison Wells was this: 'I was up to see the boys a few days ago.' He (Wells) asked me how they were getting along. I replied: 'They seem to be somewhat uneasy, from the way

Robert talks.' (Bob Pierson's appeal was then pending.) Said I: 'He offered me one thousand dollars to make it appear that I was at Tom Pierson's house that night, and said he would give me an order for five hundred dollars of it right down if I would say I would do it, and I told him I could not do any such thing; but, says I, Bob, if I was mean enough to do that, people would say right straight that I had something to do with it, and that I had a hand in it.' Said I, further, 'I could not do it anyhow.' Bob said: 'Well, if you would do it, you might save us both.' That is what I told Madison Wells. Tom Pierson told me to tell Madison Wells to come to see him, which I did. I talked with Bill Davis about what my evidence was. I told him that I could not see that I could do the boys any good, and that I could only state that Tom was not drinking on that evening. I did not use the expressions suggested by Mr. Moore."

District clerk James P. Hart testified, for the defense, that the three pistols in evidence had been in his possession since they were delivered to him by sheriff Hornsby, before Bob Pierson's trial. Sheriff Hornsby testified that the three pistols were delivered to him by John Tulk, who said that he got them from Tom Pierson's house. Witness gave them to the witness Hart.

Felix Gatling testified, for the defense, that the three pistols in evidence were in all respects similar to the three pistols secured at defendant's house about twelve o'clock on the day after the shooting of Doctor Stovall. John Tulk took charge of the pistols. After examining the pistols, witness came to the conclusion that neither of them was the pistol with which Doctor Stovall was shot. Witness did not make a close examination of the small pistol, because it was not in serviceable order, and he did not think a person would use such a weapon to shoot a man with. The short British bull-dog pistol had some "fus" about the cylendar, and was loaded all around. The other pistol had not, in the judgment of witness, been discharged within the previous twenty-four hours.

Cross-examined, witness testified that the pistols were secured six hours or more after defendant's arrest. Two of the pistols were empty, and one was loaded all around. Mrs. Pierson delivered the empty pistols to John Tulk at the door. She said that there were no loaded pistols on the place. Tulk insisted on a search of the house, and found the loaded weapon in Miss Pierson's trunk.

Tom Pierson, jr., the son of old Bob Pierson, recalled by the

defense, testified that he knew Leff Davis and his wife Hattie, who was his cousin on his mother's side. Witness was at the house of Leff Davis's father on the Friday night before Lee Leverton was arrested. Leff Davis, his wife, his brother, three sisters and witness went to church that night at the Willow Springs meeting house. Witness had no conversation with Leff Davis on that night. At this point questions were asked and answers made as follows:

Question—"Did Miss Davis ask you if your father had to go to the penitentiary?" Answer—"She did not ask me anything about it."

Question—"And did you say: 'Yes, the officers will start with him on Sunday morning?" Answer—"I did not tell them that."

Question—"That you had so heard—did you say that?" Answer—"I told Leff Davis's father, and they were not there. No one was present except Leff Davis's father and myself."

Question—"Did this occur in the church?" Answer—"No, it did not."

Question—"Did you say in the presence of Leff Davis's wife that he (witness's father) would have to go, or that the officers would leave with him on Sunday?" Answer—"No, I did not."

Question—"Did Davis say to you: 'Well, as your father, Tom, has to go to the penitentiary any way, will you tell me if you have any idea who killed Doctor Stovall?" Answer—"That was not mentioned between me and him at all."

Question—"And did you say in reply: 'Yes, my father killed him, and I was along?'" Answer—"I did not say it, and I did not tell him anything about it. The question of that murder was never mentioned between him and me."

Question—"Did you not then say: 'If we could work somebody in as having killed Doctor Stovall, it would do my father good?'" Answer—"No, I did not say that."

Question—"And did not Davis ask: 'Who are you going to try to work in?' and did not you reply: 'I don't know who; we will work in anybody we can?'" Answer—"I never mentioned that to no one."

Question—"And after that was over, did you not tell him to say nothing about it?" Answer—"I did not have any conversation with him concerning that at all."

Question—"Did not Davis say to you: 'If I am put on the stand about it, I will have to swear to what you have said?'" Answer—"I said nothing of the kind to him."

Leff Davis testified, for the defense, in substance, that old Bob Pierson, young Tom's father, married his, witness's, paternal aunt. Witness and his wife, accompanied by young Tom, attended church on the Friday night before the arrest of Lee Leverton. After services began the witness asked young Tom if his father had to go off. Young Tom replied in the affirmative, and said that he thought the next Sunday was the day set for his departure. Witness then said: "Tom, being that he has got to go off, have you got any idea who killed Doctor Stovall?" Young Tom replied: "Yes, pa killed him, and I was along with him. I went on back to uncle Tom's and stayed all night, and pa went on home. But if we can work anybody else into it it will help pa." Witness then asked him who he expected to work into it, and he replied that he did not then know. He then told witness not to speak of the matter, and added: "I ought not to talk this way to you; if you are put on the stand you will have to tell it."

Cross-examined, witness said that he had related this conversation to no one but Major Walton, until now. Witness was present at the trial of his father-in-law, Lee Leverton, but did not tell what young Tom had said to him about the killing of Doctor Stovall.

The deposition of Mrs. Hattie Davis, the wife of the witness Leff Davis, and the daughter of Lee Leverton, was next read in evidence by the defense. The deposition occupies several pages of the transcript, but amounts, in effect, to no more than a complete corroboration of the testimony of her husband. The witness was a niece of the defendant.

M. M. Hornsby, sheriff of Travis county, recalled by the defense, testified that he told old Bob Pierson that he thought he would be taken to the penitentiary on Sunday, July 12 1885. He was started on Tuesday, July 14, 1885. Young Tom met him en route to the depot, and went that far with him. The defense closed.

The State offered in rebuttal the almanic for the meridian of Texas, which showed that the sun set on Monday, March 16, 1885, at nine minutes past six o'clock.

J. W. Hewlett testified, for the State, in rebuttal, that he and C. F. Hill were the notaries public who took the depositions of Lee Leverton and wife in this case. One of the interrogatories propounded by Lee Leverton related to certain statements made to him by Madison Wells,—the same with reference

to which Leverton was examined on the trial. In answer to that interrogatory Leverton said that he did not make the statement as it was quoted in the interrogatory. He said that he stated to Madison Wells that he had been to see the boys in jail; that Wells asked him what the boys thought, and that he replied that they seemed to be pretty badly scared up; that he had been offered $500 to make it appear that the defendant, on the night of the killing, was on the opposite side of the creek.

Henry Hirshfield testified, for the State, in rebuttal, that J. Woods Smith told him, in his store in the city of Austin, that defendant was at his house on the night of the shooting between seven and eight o'clock.

Tom Jones having testified, for the defense, exactly as he testified upon the trial of Bob Pierson (see 18 Texas Ct. App., 556), the State recalled Fayette Smith in rebuttal. He testified that Tom Jones was on the Swank farm, drunk, on the night that Doctor Stovall was shot. He was too drunk to walk straight. He got on his horse, and witness went with him to the gate, which he opened to let Jones reach the road. Witness did not see Doctor Stovall when he opened the gate for Jones.

W. T. Hart, recalled by the State, testified, in rebuttal, that he had a conversation with J. Woods Smith, in Wade Smith's store, a few days after the killing. In that conversation Woods Smith said that when defendant was arrested, and was about starting to town, he said to him: "Mr. Smith, you know I was at your house last night," and that he (Smith) replied: "Yes, but you were not there late enough to do you any good." Witness heard young Felix, Wood Smith's son, tell his uncle Felix E. Smith, that defendant was at his father's house between seven and eight o'clock on that night.

Honorable Felix E. Smith testified, for the State, in rebuttal, that his nephew Felix, Woods Smith's son, told him that it might have been as late as eight o'clock when the defendant left his house on the night of the shooting of Doctor Stovall.

William Davis, recalled by the State, testified, in rebuttal, that Lee Leverton told him that the boys in jail sent for him; that he could tell nothing which would benefit them; that if he went on the stand he would be arrested; that he went to Doctor Stovall's house on the night of, but before the killing; that en route he made up his mind not to let himself be known, but to "mumble" off something and leave; that when he got to Doctor Stovall's house, a woman set the dog on him, and he turned

and left, going towards the point where the shooting presently occurred; that before he got to that point, he heard the shooting, turned into and through a field above his house, cut the wire fence, and turned his pony loose into the lane.

Cross-examined, witness stated that Bob Pierson married his sister. It was the recollection of the witness that Bob Pierson, at the jail, told him that Lee Leverton was to be arrested for complicity in the Stovall murder. Witness was summoned as a witness in the Leverton trial, but did not get to town until late in the evening, when he told Mr. Moore, special prosecuting attorney, all he knew about this matter. Witness did not know why Mr. Moore did not put him on the stand. Captain Sneed, for the defense, talked to witness; but Major Walton did not. Witness related the facts now stated to Honorable Felix E. Smith, but he could not remember when nor where. He told Leff Rose at his house.

W. D. Miller testified, for the State, in rebuttal, that Woods Smith told him at his house that the defendant left his (Smith's) house between seven and eight o'clock on the night of the shooting of Doctor Stovall; that, if riding a good horse, the defendant, in the time that elapsed between his leaving his house and the shooting of Doctor Stovall, at half-past nine o'clock, could have gone to Austin and killed a man. Witness could not state the exact distance from Woods Smith's house to Austin, but thought that eight and a half miles would cover it. The shooting of Doctor Stovall occurred at a point seven miles from Austin, less about three hundred yards.

The motion for a new trial raised the questions discussed in the opinion.

*Walton, Hill & Walton, Sheeks & Sheeks,* and *Sneed, Pendexter & Burleson,* filed an able and exhaustive brief and argument for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. This is a companion case to that of Bob Pierson v. The State, 18 Texas Court of Appeals, 524. A joint indictment charged appellant and his brother, Bob Pierson, with the murder of J. C. Stovall, and, upon a severance, Bob was tried first and convicted of murder of the second degree, with a penalty assessed of thirty years in the penitentiary; the convic-

tion in this case being for murder of the first degree, with a life term in the penitentiary affixed by way of punishment.

1.   A motion for change of venue was made by defendant in this case, based upon the statutory grounds "that there exists in the county where the prosecution commenced, so great a prejudice against him that he can not obtain a fair and impartial trial." (Code Crim. Proc., Art. 578, sub-div. 1.)   Seven compurgators supported by their affidavit the affidavit made by the defendant.

Our statute provides how an application for change of venue may be controverted, as follows : " The credibility of the persons making affidavit for change of venue, or their means of knowledge, may be attacked by the affidavit of a credible person, and the issue, thus formed, may be tried and determined by the judge, and the application granted or refused, as the law and the facts shall warrant." (Code Crim. Proc., Art. 583.)   With this statute as his authority the district attorney, by motion, resisted the application, and in support of his motion, and as parts thereof, filed two affidavits, the first being signed by seventeen private citizens, and the second by six deputy sheriffs of Travis county.   In these affidavits it was alleged "that there does not exist in Travis county, Texas, where the above stated cause was commenced and is now pending, so great a prejudice aginst Tom Pierson, the defendant in said cause, that he can not obtain a fair and impartial trial ; that the means of knowledge of defendant's compurgators (naming them), being all the persons upon whose affidavits the change of venue is sought in this case by the defendant, are imperfect touching the prejudice alleged to exist in Travis county, Texas, against the defendant, Tom Pierson ; and their conclusions that the defendant, Tom Pierson, can not get a fair and impartial trial in Travis county, is not true in fact, and their means of knowledge, and their information upon the question of a prejudice against Tom Pierson in said county, is not sufficient to authorize the making of said affidavits."

Defendant demurred to these controverting affidavits ; first, in so far as they tendered an issue of "no prejudice," upon the ground that the law did not authorize, nor permit, such an issue to be tendered ; and second, because the affidavits, in so far as they attempted to attack the means of knowledge of the compurgators, were too general, were negative only, and averred no affirmative fact.   The demurrer was overruled, and the court

held that the burden of proof rested upon the State to establish "no prejudice."

No error is perceived in the action of the court in overruling the demurrer. In the absence of any statutory declaration as to what shall be the requisites of the controverting affidavits, we are not prepared to say that a general denial, under oath, of the sufficiency of the means of knowledge of the compurgators, would not be such an attack upon their knowledge as would authorize the issue of "prejudice" or "no prejudice," and the introduction of evidence upon that issue. This whole question was ably discussed by Judge Hurt in Davis v. The State, 19 Texas Court of Appeals, 201. He says: "But where the affidavit of some credible person is made, controverting the credibility or the means of knowledge of the compurgators, an issue is formed; and, until this be done, there being no issue between the parties, there is nothing to be tried and determined by the judge. But when this is done, upon whom rests the burden of proof? We think upon the applicant—the defendant. This, however, is a nice question. The affidavit controverting the defendant's supporting affidavit being made, 'the issue thus formed shall be tried and determined by the judge, and the application granted or refused as the law and facts shall warrant.' The judge must try and determine the issue formed in the manner directed in said Article (583), and this shall be done as the law and facts shall warrant. What facts? Those adduced on the trial of the issue thus formed; and by Article 584 the facts adduced on the trial of this issue must, to authorize this court to revise the order refusing a change of venue, be reserved in a bill of exceptions. If the credibility of the supporting affiants is, by the proper affidavits, made the issue, the evidence must be confined to this issue; and so with regard to the means of knowledge, if that be the issue formed. Just what facts are admissible under the last issue (that relating to the means of knowledge of the supporting affiants) presents an exceedingly difficult question. We believe that, under the issue, the defendant would have the right to prove the existence of the prejudice by any witness, besides the affidavit of his compurgators; and, on the other hand, the State would have the right to prove that no such prejudice did in fact exist. The supporting affiants could thoroughly be tested, as to their means of knowledge, by either party."

Under this exposition of the law and practice in such matters, we see no error in the ruling complained of in this instance.

True, the court imposed the burden of proof in this case upon the State instead of defendant, but of this it cannot be possibly conceived how the defendant could be heard to complain. And, for the same reasons as above stated, the court did not err in admitting the testimony of witnesses introduced by the State to prove the issue formed, over objections of defendant, as shown by his bills of exceptions upon that point.

2. It is insisted that the court erred in holding the proposed juror, Kirby, competent, he, the juror, having heard the previous trial of Bob Pierson, upon almost identically the same state of facts. This precise question was determined in Thompson v. The State, 19 Texas Court of Appeals, 594. In that case the proposed juror had heard the previous trials of appellant's co-defendants, and had made up and formed an opinion as to their cases, and thought the result-reached in those cases (convictions) was all right, but he stated that he had no opinion of the guilt or innocence of the defendant in that case, and could give the defendant a fair and impartial trial in that case. (Acts Nineteenth Legislature, p. 91). It was held that "the mere fact that a juror has heard the evidence on a prior trial of the same case will not disqualify him. (Parchman v. The State, 2 Texas Ct. App., 228; Wade v. The State, 12 Ct. App., 358.) There must be established in his mind a conclusion of the guilt or innocence *of the accused,* and this conclusion must be such as will influence him in his verdict.   *   *   *   A mere impression, though derived from the evidence (heard on a former trial), does not disqualify a juror unless it would influence his finding." (Rothschild's case, 7 Texas Ct. App., 520; and see acts Nineteenth Legislature, p. 91; Code Crim. Proc., Art. 636, sub-div. 13.)

3. The venireman Houghton stated, as a reason why he thought he was disqualified, that he was one of the compurgators to the defendant's application for change of venue. He was held competent by the court, and the State accepted him as a juror. The juror protested that, if he was required to act as a juror, and defendant should be acquitted, he would be blamed; whereupon the court stood him aside without defendant being asked to excuse, accept or reject him. Defendant excepted to the ruling, whereupon the State's counsel proposed to have the juror brought back and impaneled. He was subsequently, and before the panel was complete, brought back and tendered to defendant, and defendant's counsel was asked if he would have the venireman sworn as a juror. His reply was, "defendant

stands mute," and the court again finally discharged the juror. Under the circumstances, defendant has no ground of complaint. He could have had the juror had he so desired, and if he has been deprived of a valuable juror, he has no one to blame but himself. The rule invoked from Earley's case, 1 Texas Court of Appeals, 249, with regard to silence of accused when required to waive error, is not applicable to the facts here presented. There was no possibility that injury had been done the defendant when the juror was again tendered to him.

4. It is not error to refuse to permit a defendant to challenge a juror peremptorily after he has exhausted his twenty peremptory challenges, as was sought to be done by appellant in the case of the juror Wahrman. (Thompson v. The State, 19 Texas Ct. App., 594; Kennedy v. The State, 19 Texas Ct. App., 619.)

5. Objection was made, and exception reserved, to the admission of the testimony of Gagnan and Tomberlin, as to declarations made by the wounded man to them as soon as they reached him, which was in about five minutes from the time they heard the shots fired and the cry for help,—time to run about one hundred and twenty yards. These declarations, made under such circumstances, come clearly within the rule of res gestæ, and were admissible. (Warren v. The State, 9 Texas Ct. App., 619; Booth v. The State, 4 Texas Ct. App., 202; Stagner v. The State, 9 Texas Ct. App., 441; Williams v. The State, 10 Texas Ct. App., 528; Hobbs v. The State, 16 Texas Ct. App., 517; Brunet v. The State, 12 Texas Ct. App., 521; 91 N. C. 518. See also Bob Pierson's case, 18 Texas Ct. App., 524, where this same evidence was held admissible.)

6. Dying declarations were proven by two witnesses, Doctor Swearingen and the justice of the peace, Von Rosenberg. The former was a physician called to minister to the sufferings of the wounded man; the latter was sent for as an officer to take his dying statement. Doctor Swearingen saw him the next morning after he was shot. He found him rational and thought him conscious of approaching death. The witness thought so, and because he, deceased, asked witness his opinion of the case, and when witness gave him his opinion, the dying man concurred in it, Doctor Swearingen said to him: "You know, doctor, that this character of cases are usually fatal, as well as I do," and he said: "Yes, I am satisfied it will kill me." We think that a sufficient predicate was laid under the requirements of the stat-

ute (Code Crim. Proc., Art. 748), for the admission of this witness's testimony as to the dying declarations. (Hunnicutt v. The State, 18 Texas Ct. App., 499.)

Von Rosenberg testified that, just before he wrote the declaration which was admitted in evidence, he was called into the room of the dying man, and as he went round his bed the deceased looked up and said : "Rosenberg, I cannot live, and I want to make my dying statement," whereupon the witness wrote down his declaration as follows : "It was Tom Pierson that shot me while I was on my return from Felix Smith's last night. Bob Pierson was with him. Tom was riding a sorrel, blaze face horse. They had no occasion to shoot me. I had not spoken to them a word, nor had I done anything to either of them." This declaration was signed by the dying man. A proper predicate under the statute was fully shown for the admission of the declaration also. The statement that "they had no occasion to shoot me" was not a mere inference or opinion of the wounded man, and inadmissible on that account. In Wroe v. The State, 20 Ohio State, 460, where the dying man stated that "it was done without any provocation on his part," and in Payne v. The State, 61 Mississippi, 161, where the statement was : "John Payne ought not to have shot him; that he shot him without any cause whatever," it was held in each case that the statement of fact, and not inference or opinion, was admissible in evidence.

7.　Appellant's counsel, in their brief, after stating many supposed objections to the charge of the court, ingenuously remark: "We may be hypercritical in our criticism of the charge." Our examination of the charge, in connection with the objections, has convinced us that the criticisims are hypercritical. It is sufficiently full and explicit, and appellant's counsel should have requested instructions upon the points which, in our opinion, needed amplification or further explanation. No additional instructions were asked.

8.　Objections are made to the closing speech before the jury on the part of the State, and the supposed objectionable remarks are presented in full in the bill of exceptions. These remarks were made in reply to arguments used by defendant's counsel. It is candidly stated, in connection with this exception that, "during the argument of one of the counsel for defendant, he stated as a fact that Bob Pierson had been convicted and given

thirty years in the penitentiary by a verdict of the jury, appealed his case to the Court of Appeals, where it was affirmed; that he was now in the penitentiary, paying the penalty for his crime, and that he, counsel, believed from the evidence in this case, that there was a conspiracy on the part of Bob Pierson's family and friends to force a conviction of defendant and some other person, to the end that such convictions might be used with the executive, in an effort to obtain clemency for Bob Pierson, or words of this substance; and further, by Mr. Sheeks, that the murder was a most dastardly and cowardly one; that the defendant was incapable of committing an act so cowardly, and he appealed to the jury to look into defendant's face for evidence of courage and consequent incapacity to commit such a crime."

Prosecuting counsel, in a masterly manner, took up the gauntlet thus thrown down, and ably, eloquently and with telling force, presented the State's side of the collateral issues thus forced upon the prosecution. We are not prepared to say that his remarks were not entirely legitimate, independent of the provocation and invitation thus given by the defense. If the defendant wishes to invoke the rule of confinement to the record, they, themselves, must keep within the record. When they voluntarily go outside, they at least invite, if they do not render it necessary, that the prosecution should follow. Appellant's counsel characterized the deed as a most dastardly and cowardly murder, and requested the jury to look into defendant's face for evidence of courage and incapacity to commit such a crime. Answering this argument the reply was: "Whoever saw that face (pointing at defendant) that could ever forget it? No, gentlemen, no. As the pistol flashed, there was a circle of light in his front, and through it gleamed the eyes of the assassin sitting there (pointing at defendant) in this court room."

This reply was called for, and was legitimate. As stated above, if the remarks excepted to were not legitimate primarily, they were most clearly so, and entirely within the bounds, as answers to the above arguments of defendant's counsel.

We have discussed all the questions raised by distinguished counsel in their able brief in this case. They have done all, perhaps, that legal skill and ability could do for an unfortunate client whose guilt of murder in the first degree has been satisfactorily established by means of fair and impartial trial, in

which no reversible error has been committed.   It only remains for us to affirm the judgment, and it is accordingly in all things affirmed.

*Affirmed.*

Opinion delivered March 7, 1886.